UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

LINDA LOU BUCZAKOWSKI,

                           Plaintiff,

        -against-                                    5:18-CV-0330 (LEK/ML)

CROUSE HEALTH HOSPITAL, INC.,
*et al.*,

                           Defendants.

---

## MEMORANDUM-DECISION AND ORDER

## I.    INTRODUCTION

Plaintiff Linda Lou Buczakowski commenced the present action against Crouse Health

Hospital, Inc. ("Crouse" or the "Hospital"), John Bergemann, Lisa Dittrich, Catherine Greenia,

and Dorothy DiCarlo (collectively, "Defendants") alleging civil rights violations under the Age

Discrimination in Employment Act ("ADEA"), the Americans with Disabilities Act ("ADA"),

and the New York State Human Rights Law ("NYSHRL"). Dkt. No. 49 ("Amended

Complaint"). Presently before the Court is Defendants' motion for summary judgment. Dkt. Nos.

125 ("Motion"), 125-1 ("Defendants' Statement of Material Facts" or "Defs.' SMF"), 125-2

("Defendants' Memorandum of Law"), 132-32 ("Plaintiff's Response to Defendants' Statement

of Material Facts" or "Pl.'s Resp. to Defs.' SMF"), 132-33 ("Plaintiffs' Additional Statement of

Material Facts" or "Pl.'s Add'l SMF"), 132-34 ("Opposition"), and 136 ("Reply"). For the

following reasons, the Motion is granted in part and denied in part.

## II.   BACKGROUND

### A. Factual History

The following facts are undisputed, except where otherwise noted.

### 1. The Parties

Plaintiff is a former employee of the Hospital, which is located in Syracuse, New York. Defs.' SMF ¶¶ 1–2; Pl.'s Resp. to Def.'s SMF ¶¶ 1–2. Plaintiff was hired by the Hospital in October 2012 as a Patient Access Representative. Defs.' SMF ¶ 7; Pl.'s Resp. to Def.'s SMF ¶ 7. Upon commencement of her employment, Plaintiff became a union member of 1199 SEIU (the "Union"), and received copies of the collective bargaining agreement ("CBA") between the Union and the Hospital, as well as the Hospital's employee handbook. Defs.' SMF ¶¶ 8–9; Pl.'s Resp. to Def.'s SMF ¶¶ 8–9. In October 2013, Plaintiff was transferred to the Business Office and became a Patient Account Representative—Float ("PAR Float"). Defs.' SMF ¶ 11; Pl.'s Resp. to Def.'s SMF ¶ 11.

Defendant Bergemann has been employed by the Hospital as a Director of Human Resources for the past twelve years. Defs.' SMF ¶ 3; Pl.'s Resp. to Def.'s SMF ¶ 3. Defendant Dittrich has been employed by the Hospital as Manager of Labor Relations and Benefits since 2015. Defs.' SMF ¶ 4; Pl.'s Resp. to Def.'s SMF ¶ 4. Defendant DiCarlo worked as an independent contractor for the Hospital from approximately October 2016 to February 2018. Defs.' SMF ¶ 5; Pl.'s Resp. to Def.'s SMF ¶ 5. Plaintiff further adds that DiCarlo was the Director of the Business Office. Id. Finally, Defendant Greenia served as a manager in the Hospital's Business Office, and supervised Plaintiff while she was employed in the Business Office as a PAR Float. Defs.' SMF ¶¶ 6, 12; Pl.'s Resp. to Def.'s SMF ¶¶ 6, 12.

## 2. *Plaintiff's Medical Leave and Return to Work*

Plaintiff started to experience back pain and was eventually diagnosed with cancer in August 2016. Defs.' SMF ¶ 13; Pl.'s Resp. to Def.'s SMF ¶ 13. In September 2016, Plaintiff began chemotherapy treatments. Defs.' SMF ¶ 14; Pl.'s Resp. to Def.'s SMF ¶ 14. Plaintiff requested Family and Medical Leave Act ("FMLA") leave for treatment, and the Hospital granted her request. Defs.' SMF ¶ 15; Pl.'s Resp. to Def.'s SMF ¶ 15. Then, in November 2016, Plaintiff made a second FMLA request, which was also granted. Defs.' SMF ¶ 16; Pl.'s Resp. to Def.'s SMF ¶ 16. Greenia granted all of Plaintiff's time off requests and allowed her to come in early or leave later to make up time. Defs.' SMF ¶ 17; Pl.'s Resp. to Def.'s SMF ¶ 17. Plaintiff wrote to Greenia several times thanking her for her kindness and flexibility in assisting Plaintiff to manage her work around her treatment. Defs.' SMF ¶ 18; Pl.'s Resp. to Def.'s SMF ¶ 18. Plaintiff took an additional 60 days of leave for cancer treatment, and returned to work on or about April 17, 2017. Defs.' SMF ¶ 19; Pl.'s Resp. to Def.'s SMF ¶ 19; Dkt. No. 132-2 ("Buczakowski Deposition") at 70:13–14. Defendants note that Plaintiff returned to the same position, performing the same work, at the same wage, but Plaintiff denies this, arguing that she was not restored to her prior position and duties because her position was eliminated prior to her return from FMLA leave. See Defs.' SMF ¶ 19; Pl.'s Resp. to Def.'s SMF ¶ 19. On the same day that Plaintiff returned, she emailed Bergemann to request a parking spot. Buczakowski Dep. at 71:23–72:3; Buczakowski Dep., Ex. LB 1. Plaintiff explained that she "continue[d] to have fractures in [her] vertebrae and have difficulty walking long distances, and currently ha[d] no immune system due to the high dose of chemo. . . ." Id. Bergemann expressed his concerns about Plaintiff working with no immune system, and wanted to see if Plaintiff was cleared to return to

work. Id. Additionally, Bergemann granted the request. Id.; Buczakowski Dep. at 72:4–5. Plaintiff responded by thanking him and explaining that she was released by her physicians and was on daily antibiotics. Buczakowski Dep., Ex. LB 1.

### 3. Business Office Changes

DiCarlo was hired by Crouse to evaluate the Hospital's performance after its conversion to a new computer platform. Defs.' SMF ¶ 21; Pl.'s Resp. to Def.'s SMF ¶ 21. After evaluating the Hospital's performance, DiCarlo began planning changes to the Business Office.[1] Defs.' SMF ¶ 22; Pl.'s Resp. to Def.'s SMF ¶ 22. Defendants contend that it was a departmental reorganization, but Plaintiff denies that those changes were referred to as a "reorganization." See Defs.' SMF ¶ 22; Pl.'s Resp. to Def.'s SMF ¶ 22. The Hospital and the Union began discussing the Business Office changes at Labor Management meetings in April 2017. Defs.' SMF ¶ 25; Pl.'s Resp. to Def.'s SMF ¶ 25.[2] Marty Warner, Chair of the Union's Service, Maintenance and Clerical unit, and Veronica Clanton, Vice Chair of the Union's Service, Maintenance and Clerical unit, attended these meetings on behalf of the Union. Defs.' SMF ¶ 26; Pl.'s Resp. to Def.'s SMF ¶ 26. As part of the changes to the Business Office, there were changes to the PAR Float position, but the parties disagree on the nature of these changes. See Defs.' SMF ¶ 27; Pl.'s Resp. to Def.'s SMF ¶ 27. Defendants contend that the PAR Float position was reclassified, but

---

[1]  The parties disagree on DiCarlo's role and responsibilities. See Defs.' SMF ¶¶ 23–24; Pl.'s Resp. to Def.'s SMF ¶¶ 23–24.

[2]  Plaintiff's response mainly deals with the fact that Defendants finalized the proposed plan prior to the meeting, but does not deny that the April 2017 meeting was the first time that the plan was discussed with Union representatives. See Pl.'s Resp. to Def.'s SMF ¶ 25.

Plaintiff argues that the position was eliminated and the Floats were reassigned to other jobs with the exception of Plaintiff. See Defs.' SMF ¶ 27; Pl.'s Resp. to Def.'s SMF ¶ 27.

### 4. May 4th Events

On May 4, 2017, an informal meeting was held in the Business Office to announce the changes. Defs.' SMF ¶ 28; Pl.'s Resp. to Def.'s SMF ¶ 28. DiCarlo proceeded to give the different Floats their positions. Dkt. No. 132-3 ("Buczakowski Deposition") at 94:12–13. All of them received a position except Plaintiff, because Plaintiff's had not been determined yet. Id. at 96:5–8; 100:1–3; 100:14–16. After the meeting, Plaintiff went to her desk and started looking at the posted positions that she could bid on. Id. at 100:4–101:19. Shortly afterwards, Union representative Clanton came over to Plaintiff and asked to talk to her. Id. at 102:15–17. Plaintiff agreed, and the two headed over to the atrium. Id. at 102:24–103:4. There, Clanton introduced Plaintiff to Bergemann, who was already there. Id. at 103:4–103:18. Plaintiff and Bergemann have differing accounts of the meeting. See Defs.' SMF ¶ 31; Pl.'s Resp. to Def.'s SMF ¶ 31. According to Plaintiff:

> I sat down, and he -- he -- first told me to leave Crouse Hospital due to my medical condition. He told me to leave Crouse Hospital -- actually, what he said was to leave Crouse Hospital, apply for Social Security due to my medical condition and the fact that I had no immune system. He further stated and if I didn't want to do that, I could retire and apply for Medicare.

Id. at 103:18–25. Plaintiff also asked Bergemann if she was being terminated, and Bergemann responded in the negative. Id. at 105:25–106:4, 106:17–23.

According to Bergemann, employees had reach out to Clanton and him because they were concerned with Plaintiff's health coming back to work. Dkt. No. 132-5 ("Bergemann

5

Deposition") at 140:1–4, 140:7–141:9. Employees reported to management, who reported to Bergemann, that they were concerned that Plaintiff was unhealthy and that she was being forced to come to work. Id. at 142:10–21. The first time these concerns reached Bergemann, he did not act upon them. Id. at 145:7–10. And then Kelly Harris, the Chief Financial Officer, suggested to Bergemann that he should speak to Plaintiff about her health and that she should not come back to work until she was feeling better. Id. at 146:4–5, 147:8–14. During this time, DiCarlo expressed to Bergemann that Plaintiff's work was not getting done, and that it was a lot for her to be going through treatment and coming to work. Id. at 148:15–25. As for his conversation with Plaintiff:

> I tell Linda who I am. I ask Linda -- said, "I've heard that, you know, you're not in the -- you have medical issues going on. Are you aware of all your options available to you from disability, Social Security Disability, which could lead to retirement, or FMLA?"

Id. at 174:16–21. Plaintiff refused to discuss this with Bergemann and the meeting ended. Id. at 174:22-24.

After the meeting with Bergemann, Plaintiff emailed a request to DiCarlo to see if she could meet with her. Buczakowski Dep. at 108:18–20. After sending the message, Plaintiff waited a few minutes before going to DiCarlo's office. Id. at 110:5–7. The parties agree Plaintiff and DiCarlo discussed the fact that Plaintiff would be able to bid on jobs, Defs.' SMF ¶ 30; Pl.'s Resp. to Def.'s SMF ¶ 30, but there is disagreement on some of the comments made by DiCarlo. According to Plaintiff:

> She told me that I could bid on jobs -- on the jobs. But she went on to tell me that she didn't think I had been friendly, amicable, I think was the word she used. I altered it when I responded to her using the word friendly. She did consider me to be of low intelligence.

Buczakowski Dep. at 113:19–24. Allegedly, DiCarlo did use the exact words, "low intelligence." Id. at 113:25–114:2. Furthermore, Plaintiff stated that she would not be bidding nor leaving her position. Id. at 114:5–9. However, DiCarlo did not recall telling Plaintiff that she was of "low intelligence." Dkt. No. 132-7 ("DiCarlo Deposition") at 60:7–9. Instead, she recalled that she did not have the information at that time to tell Plaintiff her position placement. Id. at 60:10–18. She sensed Plaintiff's displeasure and got a sense from Plaintiff that things were not going smoothly with respect to her reassignment and retitle of her position. Id. at 61:1–2, 62:3–7.

### 5. *Soarian Training*

After the changes were announced, Greenia had a meeting with Plaintiff and a coworker about training on Soarian, the Hospital's new computer platform. Defs.' SMF ¶ 32; Pl.'s Resp. to Def.'s SMF ¶ 32. The type of Soarian training assigned to employees was determined by their position. Defs.' SMF ¶ 33; Pl.'s Resp. to Def.'s SMF ¶ 33. Plaintiff was able to use many different parts of Soarian prior to the training. Defs.' SMF ¶ 34; Pl.'s Resp. to Def.'s SMF ¶ 34. Plaintiff was only scheduled for introductory Soarian training. Defs.' SMF ¶ 35; Pl.'s Resp. to Def.'s SMF ¶ 35. Greenia felt that Plaintiff acted rudely and did not pay attention, and she documented her evaluation of Plaintiff's behavior in an email. Defs.' SMF ¶ 36. Plaintiff denies that she acted as Greenia alleged in the email. Pl.'s Resp. to Def.'s SMF ¶ 36.

### 6. *May 11th Events*

On May 11, 2017, there was another meeting held at the Business Office. Buczakowski Dep. at 119:1–3. DiCarlo called the meeting to inform the employees about new office layout changes. Id. at 119:4–120:15. After the meeting, Greenia went around informing people if their desk was being moved, but she ignored Plaintiff. Id. at 122:7–14. So, Plaintiff decided to go ask

7

DiCarlo if she knew what Plaintiff's position would be. Id. at 122:8–10.[3] Plaintiff testified that

DiCarlo became furious when she asked about the new position. Id. at 122:20–25. Furthermore,

DiCarlo told Plaintiff that her position was eliminated, that she wanted Plaintiff out of her office

by the end of the day, and that she was contacting Human Resources immediately. Id. at

122:25–123:3. DiCarlo, for her part, did not recall the meeting, DiCarlo Dep. at 129:3–7,

142:20–143:15, but both DiCarlo and Plaintiff agree that DiCarlo partially followed Plaintiff

back to her work area, see id. at 145:2–9; Buczakowski Dep. at 123:24–25.

  After that, Plaintiff went to Bergemann's office. Defs.' SMF ¶ 39; Pl.'s Resp. to Def.'s

SMF ¶ 39. According to Bergemann, Plaintiff was speaking in a raised voice and waiving a

finger at him, that she refused to stop engaging in such behavior when asked, that Plaintiff stated

that she would not meet with the Hospital's management to discuss her position change, and that

Plaintiff told him to fire her. Defs.' SMF ¶ 40; Pl.'s Resp. to Def.'s SMF ¶ 40. However,

according to Plaintiff, she gave a list of the ways that she was being treated that she did not think

were right, which included the disclosure of her medical information to Clanton in the atrium.

Buczakowski Dep. at 128:16–129:4. During the meeting, Bergemann called Dittrich in. Id. at

136:4–7.[4] Plaintiff then walked out before saying:

> "Mr. Bergemann, you have given me the truth about the elimination
> of my position in the business office. So now you have the choice that
> you can either charge me with insubordination, as I am leaving, or
> you can fire me for just cause, but I have a Soarian meeting,

---

[3] The parties dispute only whether Plaintiff came to DiCarlo's office uninvited. See Defs.' SMF ¶ 38; Pl.'s Resp. to Def.'s SMF ¶ 38.

[4] The parties dispute how loud Plaintiff's voice was during the meeting. See Defs.' SMF ¶ 41; Pl.'s Resp. to Def.'s SMF ¶ 41.

> introductory meeting that I'm supposed to be at, and I'm going to be
> a couple minutes late[]"

Id. at 139:7–14.

After leaving Bergemann's office, Plaintiff went to a Soarian training in the Marley Education Center. Defs.' SMF ¶ 43; Pl.'s Resp. to Def.'s SMF ¶ 43. When Plaintiff arrived and took a seat, she claims that a supervisor embarrassed Plaintiff in front of everybody by saying that "[s]he's only going to be staying here for the introductory meeting and then she will be returning to the business office to her desk to do the work that she's assigned." Buczakowski Dep. at 144:17–144:20. The parties disagree on what happened next. According to Defendants, Dittrich, accompanied by Warner as Plaintiff's Union representative, excused Plaintiff from training to speak with her regarding her conduct in Mr. Bergemann's office. See Defs.' SMF ¶ 44. Plaintiff contends that Dittrich and Warner interrupted the training session, announcing out loud that they were removing Plaintiff without regard for her embarrassment, humiliation, or the disruption they caused. See Pl.'s Resp. to Def.'s SMF ¶ 44. Warrner affirmed that "in a loud voice, and while waiving a finger at Dittrich, Buczakowski said she would not talk about [her conduct] and walked away." See Defs.' SMF ¶ 45. However, Plaintiff testified that Warner told her that she was being sent home, and that if she did not leave, he would be calling the security guards. Buczakowski Dep. at 150:17–151:2. Plaintiff did go home early that day. Id. at 153:6–154:3. Plaintiff believed that she should return to work on May 15, 2017, based on what Warner told her, but she was asked to leave. Id. at 157:6–10; 158:1–5. Later on May 15, Dittrich called Plaintiff to return to a disciplinary meeting later that week. Id. at 155:24–25, 160:17–24, 161:14–20.

7. *May 17 Disciplinary Meeting*

On May 17, 2017, Plaintiff met with management employees of the Hospital and Union representative Adrienne Valenti to discuss her discipline for her conduct on May 11, 2017. Defs.' SMF ¶ 47; Pl.'s Resp. to Def.'s SMF ¶ 47. A Record of Corrective Discipline was issued by which Plaintiff was suspended for three days. Defs.' SMF ¶ 48; Dkt. No. 132-8 ("Dittrich Deposition"), Ex. LD 7. Plaintiff contends that she was suspended for approximately 4.5 days from the time she was sent home on May 11 through May 17. Pl.'s Resp. to Def.'s SMF ¶ 48. At the meeting, Plaintiff was given bumping and bidding paperwork[5], as well as a severance option. Buczakowski Dep. at 167:25–168:3; Defs.' SMF ¶ 49; Pl.'s Resp. to Def.'s SMF ¶ 49. Plaintiff was given about a week to determine which option she would exercise, Buczakowski Dep. at 168:4–168:6, but she contends that many of the "available" positions given to Plaintiff were not actually available, see Pl.'s Resp. to Def.'s SMF ¶ 50. Finally, at the meeting, Dittrich stated that they were going to use what was remaining of Plaintiff's vacation time to cover the three-day suspension. Buczakowski Dep. at 167:11–15. Plaintiff asserts that she explained that she was saving her vacation time specifically for medical treatment, Pl.'s Add'l SMF ¶ 194, but Dittrich did not recall her objecting that she needed her vacation time for her appointments, Dittrich Dep. at 236:20–24.

8. *New Position and Resignation*

Ultimately, Plaintiff accepted a Patient Access Representative position, but Plaintiff contends that she did not "choose" to bump; rather, she accepted under duress. See Defs.' SMF ¶

---

[5]  This Court, in a similar case brought by Plaintiff, already explained the difference between "bidding" and "bumping." See Buczakowski v. 1199SEIU, No. 18-CV-0812, 2021 WL 2313629, at *4 n.3 (N.D.N.Y. June 7, 2021) (Kahn, J.).

52; Pl.'s Resp. to Def.'s SMF ¶ 52. Plaintiff reported for her first day in her new position on June 5, 2017. Defs.' SMF ¶ 53; Pl.'s Resp. to Def.'s SMF ¶ 53. Plaintiff met with Hospital employees in the presence of Clanton, who Plaintiff did not request to be there on her behalf. See id. After the meeting, Plaintiff began training for her new position. Defs.' SMF ¶ 55; Pl.'s Resp. to Def.'s SMF ¶ 55. Sometime during the day, Clanton talked to Plaintiff about her time off requests:

> Next thing, Veronica speaks up and starts telling me how I wouldn't be given time off because I am now entering a department bigger than mine. I'm on low seniority in that department. That -- the most likelihood is that if I ask for -- request time off, any time off, I would not be -- it would not be approved. The only difference she made this time is she went as far as to say that we wouldn't -- you could not take it. She said that your time off would most likely not -- at that point, I knew what was going on. I don't have approved time. This goes back to the contract. This goes back to Tracey Varre's [sic] repeated threatening of me. The union contract has specific disciplines that result in termination if I was to take time off for my medical. Simple as that. And I knew it from the way that Veronica talked to me.

Buczakowski Dep. at 208:2–17.

Then, during a training later in the day, Plaintiff asked to stop the training and she decided to resign from her employment. Defs.' SMF ¶ 56. Plaintiff denies that she resigned, and instead contends that she was constructively discharged from her employment. Pl.'s Resp. to Def.'s SMF ¶ 56.

### 9. Social Security Disability Benefits

After she left her employment with the Hospital, Plaintiff applied for Social Security Disability benefits in June of 2017. Buczakowski Dep. at 226:12–18. According to Defendants, Plaintiff completed documentation and stated to the Social Security Administration ("SSA") that she "became unable to work because of [her] disabling condition on June 5th, 2017." See Defs.'

SMF ¶¶ 59–60. Plaintiff contends that she did not sign for or apply for disability benefits, and that the SSA representative completed the forms on her computer on Plaintiff's behalf. See Pl.'s Resp. to Def.'s SMF ¶¶ 57, 60. Furthermore, in regards to the statement that she was "unable to work because of [her] disabling condition," Plaintiff argues that is accurate as she was forced out of her job due to her disability. Id.

### B. Procedural History

Plaintiff commenced this case on March 16, 2018. Dkt. No. 1 ("Complaint"). Plaintiff moved to amend the complaint on April 10, 2019, Dkt. No. 37, and Magistrate Judge David E. Peebles granted the motion to amend, Dkt. No. 46. On July 5, 2019, Plaintiff filed an Amended Complaint. Am. Compl. Shortly thereafter, Defendants moved to dismiss the complaint on July 31, 2019. Dkt. No. 52. This Court granted the motion to dismiss in part, allowing Plaintiff's discrimination claim based on (1) failure to a reasonably accommodate Plaintiff's disability, (2) hostile work environment, (3) constructive discharge to proceed. See generally Dkt. No. 72 ("November 2019 Decision"). Additionally, the Court allowed Plaintiff's NYSHRL retaliation claim to proceed, as well as the aiding and abetting claim against the individual defendants. Id.

On January 27, 2020, Plaintiff moved to file a second amended complaint. Dkt. No. 76. On March 27, 2020, Magistrate Judge Miroslav Lovric denied Plaintiff's motion to amend. Dkt. No. 84. After Plaintiff filed objections to Judge Lovric's decision, Dkt. No. 87, this Court overruled Plaintiff's objections and affirmed Judge Lovirc's decision on January 29, 2021, Dkt. No. 114. Now that discovery is completed, Defendants filed their motion for summary judgment on May 24, 2021. Motion. Plaintiff responded on July 22, 2021, Dkt. No. 132, and Defendants filed a reply on August 12, 2021, Reply.

III.    **LEGAL STANDARD**

Federal Rule of Civil Procedure 56 instructs courts to grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute is "'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Thus, while "[f]actual disputes that are irrelevant or unnecessary" will not preclude summary judgment, "summary judgment will not lie if ... the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.; see also Taggart v. Time, Inc., 924 F.2d 43, 46 (2d Cir. 1991) ("Only when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted.").

The party seeking summary judgment bears the burden of informing the court of the basis for the motion and identifying those portions of the record that the moving party claims will demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Similarly, a party is entitled to summary judgment when the nonmoving party has failed "to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

In attempting to repel a motion for summary judgment after the moving party has met its initial burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). At the same time, a court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. Reeves v. Sanderson Plumbing Prods.,

13

Inc., 530 U.S. 133, 150 (2000). Thus, a court's duty in reviewing a motion for summary judgment is "carefully limited" to finding genuine disputes of fact, "not to deciding them." Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).

## IV.    DISCUSSION

The Court begins by addressing the merits of Defendants' summary judgment motion as to each of Plaintiff's claims.

### A.  Failure to Accommodate

Discrimination claims "may be brought under a theory of adverse employment action or of failure to provide reasonable accommodation." Berger v. N.Y.C. Police Dep't, 304 F. Supp. 3d 360, 368 (S.D.N.Y. 2018) (emphasis added) (citing McMillan v. City of New York, 711 F.3d 120, 125–26 (2d Cir. 2013)). "To maintain a prima facie claim under the ADA or the NYSHRL for failure to accommodate, an employee must show that: '(1) he is a person with a disability under the meaning of the ADA [or the NYSHRL]; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, the employee could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations.'" Buczakowski v. Crouse Health Hosp., Inc., No. 18-CV-330, 2019 WL 6330206, at *5 (N.D.N.Y. Nov. 26, 2019) (first quoting Berger, 304 F. Supp. 3d at 368–69 (S.D.N.Y. 2018); and then quoting Noll v. Int'l Bus. Machs. Corp., 787 F.3d 89, 94 (2d Cir. 2015)) (Kahn, J.). "If a plaintiff establishes a prima facie failure-to-accommodate case, the McDonnell Douglas burden-shifting framework ordinarily applies." Hensel v. City of Utica, No. 15-CV-0374, 2020 WL 1451579, at *12 (N.D.N.Y. Mar. 25, 2020) (citing Garvey v. Town of Clarkstown, N.Y., No. 13-CV-8305, 2018 WL 1026379, at *8 (S.D.N.Y. Feb. 22, 2018), aff'd

14

sub nom. Garvey v. Sullivan, 773 F. App'x 634 (2d Cir. 2019)) (Kahn, J.). Here, Plaintiff argues

that "[s]he was denied a reasonable accommodation in the form of leave to attend her medical

appointments." Opp'n at 16. Defendants raise two arguments for the Court to consider: (1)

"Plaintiff cannot prevail on her claim because she never made a request for time off that was

denied"; and (2) "Plaintiff's claim that she was denied an accommodation is also precluded by

her representations to the Social Security Administration." Defs.' Mem. of L. at 12.

*1. The Accommodation Request*

"Generally, a request for an accommodation is a prerequisite to liability for failure to

accommodate as it prevents a party from keeping their disability a secret and suing later for

failure to accommodate" Dimperio v. New York State Dep't of Corr. & Cmty. Supervision, No.

9:13-CV-1010, 2015 WL 1383831, at *6 (N.D.N.Y. Mar. 25, 2015), aff'd, 653 F. App'x 52 (2d

Cir. 2016); but see Quadir v. New York State Dep't of Lab., No. 16-CV-7476, 2020 WL

2836463, at *4 (S.D.N.Y. May 31, 2020), appeal dismissed (Dec. 11, 2020) ("However, even if

no request is made, 'an employer has a duty to reasonably accommodate an employee's disability

. . . if the employer knew or reasonably should have known that the employee was disabled.'"

(quoting Brady v. Wal-Mart Stores, Inc., 531 F.3d 127, 135 (2d Cir. 2008)). In other words, if

Brady applies, the employer is obligated to engage in "an interactive process with their

employees and in that way work together to assess whether an employee's disability can be

reasonably accommodated." Costabile v. New York City Health & Hosps. Corp., 951 F.3d 77, 81

(2d Cir. 2020) (quoting Brady, 531 F.3d at 135). Here, the parties focused on whether Plaintiff

submitted a request for accommodation, but neither side discussed Brady.[6] As a result, the Court

cannot rule on summary judgment on this ground until both sides fully brief Brady's impact on

the failure to accommodate claim. Cf. Hart v. Rick's Cabaret Int'l, Inc., 967 F. Supp. 2d 901, 936

(S.D.N.Y. 2013) ("Neither party, however, has identified, let alone addressed, this legal issue

here. For the time being, therefore, the Court declines to grant summary judgment to either party

as to this claim, and denies both sides' motions as to this claim."). Therefore, within thirty days

of this memorandum-decision and order, Plaintiff is directed to file a ten-page submission setting

forth the Brady analysis. Defendants are directed to file a ten-page opposition, two weeks

following Plaintiff's submission.

### 2. Representations to the Social Security Administration

"The interaction of statements made in applications for social security disability benefits

and ADA claims is not a new issue for the courts." DeRosa v. Nat'l Envelope Corp., 595 F.3d

---

[6] The Court did not need to address Brady's applicability in Buczakowski v. 1199SEIU, 2021 WL 2313629. The Court's research revealed only one district court case where a court applied Brady to a labor organization. See Egan v. Loc. 363, Int'l Bhd. of Elec. Workers' Union, No. 18-CV-4656, 2021 WL 1092355 (S.D.N.Y. Mar. 22, 2021). In Egan, the defendant union "maintain[ed] a job referral system through which members can be referred to employers for work as journeyman electricians. . . ." Id. at *1. The plaintiff there "argue[d] that Defendant failed to make reasonable accommodations in that Defendant failed to maintain a separate list for the referral of foremen and/or specialized computer codes to denote the foreman skillset." Id. at *7. Here and in Buczakowski v. 1199SEIU, Plaintiff's accommodation request was in the form of leave to attend her medical appointments. Unlike the union in Egan, which maintained the job referral system pursuant to a collective bargaining agreement, there is no evidence (or common sense) here to suggest that Plaintiff's union determined leave requests pursuant to a collective bargaining agreement. Thus, the accommodation request sought by Plaintiff in Buczakowski v. 1199SEIU would not be possible, and Brady's application would not change the result there. See Prindle v. City of Norwich, No. 15-CV-1481, 2018 WL 1582429, at *10 (N.D.N.Y. Mar. 27, 2018) ("Failure to engage in this interactive process does not automatically produce liability for employers if no reasonable accommodation is possible.") (citing McBride v. BIC Consumer Prod. Mfg. Co., 583 F.3d 92, 100 (2d Cir. 2009)).

99, 102 (2d Cir. 2010). "[T]he mere fact that a plaintiff files for social security benefits (and thus, represents herself to be disabled) does not create a presumption that she is unable to perform the essential functions of her job, and thus, unable to prove an ADA claim." Id. at 103 (citing Cleveland v. Policy Management Systems Corp., 526 U.S. 795, 802–03 (1999)). Still, "a sworn assertion in an SSDI application that someone is 'unable to work' could negate an element of an ADA claim unless the plaintiff offers a sufficient explanation for the apparent contradiction." Id. (citing Cleveland, 526 U.S. at 806).

In this matter, the parties submitted Plaintiff's Application Summary for Disability Insurance Benefits, where Plaintiff allegedly made the following statements: "I became unable to work because of my disabling condition on June 5, 2017" and "I am still disabled." Buczakowski Dep., Ex. LB 11. During her deposition, Defendants' counsel pressed Plaintiff on whether this was accurate:

> Q: Ms. Buczakowski, are the statements that "I became unable to work because of my disabling condition on June 5th, 2017, and I am still disabled," are those -- were those accurate statements or were they incorrect?
>
> A: I think they're accurate.
>
> MS. BOSMAN: Objection. Form.
>
> A: I think they're accurate because the way I interpret -- because my disability was the reason why I was forced out of my job or I would still be -- I should still be working there. I didn't lie to Social Security whatsoever. I told her everything. I told her everything that happened, why I was there.

Buczakowski Dep. at 234:3–15.

17

Recognizing this, Defendants argue that even if this explanation is assumed to be true, "Plaintiff cannot now establish that she was capable of performing her position with or without a reasonable accommodation as of June 5, 2017 because she had not actually been denied an accommodation as of that date." Defs.' Mem. of L. at 13. Once again, Defendants miss the point. All that Plaintiff needs to do at the summary judgment stage is to proffer a sufficient explanation for the apparent contradiction, and the Court finds that a reasonable juror could conclude that Plaintiff could "perform the essential functions" of her job, with or without a reasonable accommodation. See Bohen v. Potter, No. 04-CV-1039S, 2009 WL 791356, at *9 (W.D.N.Y. Mar. 23, 2009) ("To defeat summary judgment, that explanation must be sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good faith belief in, the earlier statement, the plaintiff could nonetheless perform the essential functions of her job, with or without reasonable accommodation.") (quoting Nodelman v. Gruner & Jahr USA Publishing, No. 98-CV-1231, 2000 WL 502858, at *8 (S.D.N.Y. April 26, 2000)). With all inferences drawn in favor of Plaintiff, she has sufficiently explained that she interpreted the statements to mean that her disability was the reason she was forced out, and if that was not the case, she would still be working. Cf. Nodelman, 2000 WL 502858, at *8 (finding that the "plaintiff [ ] proffered a sufficient explanation for the inconsistency of his claims because he argues that he would have been able to perform his job had he been provided reasonable accommodations. . . ."). The Court concludes by noting that Plaintiff's statements in her Application Summary for Disability Insurance Benefits are not irrelevant in this litigation. This, along with other evidence adduced at trial, might persuade a jury that Plaintiff was unable to

18

perform the essential functions of her job at the time of her departure from the Hospital.

Defendants' motion for summary judgment on this point is also denied.

### B.  Hostile Work Environment

To establish a claim for hostile work environment harassment under the ADA, a plaintiff

must demonstrate: "(l) that the harassment was sufficiently severe or pervasive to alter the

conditions of the victim's employment and create an abusive working environment, and (2) that a

specific basis exists for imputing the objectionable conduct to the employer." Alfano v. Costello,

294 F. 3d 365, 373 (2d Cir. 2002) (internal quotations and citations omitted); see also Bethea v.

JP Morgan Chase & Co., No. 15-CV-3544, 2019 WL 4805141, at *10 n.18 (E.D.N.Y. Sept. 30,

2019) ("Hostile work environment claims under the ADA and ADEA are evaluated under the

same standards."); Santana v. Mount Vernon City Sch. Dist./Bd. of Educ., No. 20-CV-3212,

2021 WL 4523770, at *16 (S.D.N.Y. Sept. 30, 2021) ("NYSHRL hostile work environment

claims are evaluated under the same standards as ADA and ADEA discrimination claims.").

"This standard has both objective and subjective components: the conduct complained of must be

severe or pervasive enough that a reasonable person would find it hostile or abusive, and the

victim must subjectively perceive the work environment to be abusive." Littlejohn v. City of

New York, 795 F.3d 297, 321 (2d Cir. 2015) (citing Raspardo v. Carlone, 770 F.3d 97, 114 (2d

Cir. 2014)). "In considering whether a plaintiff has met this burden, courts should examine the

totality of the circumstances, including: the frequency of the discriminatory conduct; its severity;

whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it

unreasonably interferes with the victim's job performance." Rivera v. Rochester Genesee Reg'l

Transp. Auth., 743 F.3d 11, 20 (2d Cir. 2014) (internal quotations, alterations, and citation

omitted). In addition, for "comments, slurs, and jokes to constitute a hostile work environment, there must be more than a few isolated incidents of . . . enmity." Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997). The incidents giving rise to a hostile work environment must also have "occur[ed] because of an employee's . . . protected characteristic." Rivera, 743 F.3d at 20 (quoting Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001)). As a result, this Court has recognized that "[i]n evaluating a hostile work environment claim, a court may not consider incidents unrelated to the plaintiff's protected characteristics." Guerra v. Murphy, No. 15-CV-1168, 2016 WL 7480405, at *7 (N.D.N.Y. Dec. 29, 2016) (Kahn, J.).[7] But the Second Circuit has recently reiterated that "when the same individuals engage in some harassment that is explicitly discriminatory and some that is not, the entire course of conduct is relevant to a hostile work environment claim." Rasmy v. Marriott Int'l, Inc., 952 F.3d 379, 388 (2d Cir. 2020).

Plaintiff points to the commutative effect of the following actions by Defendants in support of her hostile work environment claim: (1) Defendants' statements to Plaintiff; (2) Defendants' internal statements about Plaintiff; (3) Plaintiff's non-disabled, less senior, and younger co-workers were treated more favorably; (4) Plaintiff was repeatedly threatened with

---

[7] In their Opposition, Plaintiff argues that "[t]he Second Circuit has rejected the argument that courts must exclude from consideration allegations that do not, on their face, contain any connection to discriminatory behavior or to a person's protected status." Opp'n at 11. However, the Second Circuit has explained that "[i]t is therefore important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage or correlation to the claimed ground of discrimination." Alfano, 294 F.3d at 377 (2d Cir. 2002) (emphasis added). Additionally, the Court notes that Plaintiff misquoted Svenningsen v. Coll. of Staten Island, No. 01-CV-7550, 2003 WL 21143076 (E.D.N.Y. Mar. 28, 2003) in her Opposition by failing to include the last part of the quote. See Svenningsen, 2003 WL 21143076, at *2 ("The incidents comprising a hostile work environment need not make any reference to the trait or condition on the basis of which the discrimination has occurred, so long as the incidents can reasonably be interpreted as having taken place on the basis of that trait or condition.") (emphasis added).

termination while she was out on medical leave; (5) Plaintiff was subjected to the release of her private medical information by Bergemann; (6) Greenia's actions when Plaintiff returned to work; (7) Plaintiff was lied to and thereafter given hostile responses to questions regarding the status of her position/employment; (8) Plaintiff was subjected to intense hostile and cold demeanor, avoidance, and physical intimidation after she expressed her opposition to the way she was being treated; (9) Plaintiff was embarrassed during the training session; (10) Plaintiff's experience during the suspension and disciplinary process; (11) Plaintiff's co-workers began avoiding her and she was not provided assignments; and (12) Plaintiff's experience during the bumping process and with starting the new position. Opp'n at 11–16.

The Court begins by noting that just as in Buczakowski v. 1199SEIU, Plaintiff cannot rely on disparate treatment to support her hostile work environment claim because "there are no facts in the record to support that Plaintiff was older and that none of the other PAR Floats had a known disability." Buczakowski. 2021 WL 2313629, at *8. Additionally, although the parties dispute the nature of the atrium meeting, drawing all inferences in favor of Plaintiff, Bergemann's statements could count as "explicitly discriminatory" and the Court will consider the entire course of Bergemann's conduct (e.g. his statements to Plaintiff, his disclosure of her medical information, and the events surrounding Plaintiff's discipline). As for DiCarlo and Greenia, the Court cannot come to the same conclusion. There is no evidence that Greenia made any statement, and while DiCarlo may have told Plaintiff that she was of "low intelligence" and told Bergemann that Plaintiff's work was not getting done, and "that it was a lot for her to be going through treatment and coming to work," the Court is hard pressed to find that this or any of their other actions would count as "explicitly discriminatory." Cf. Livingston v. City of New

21

York, No. 19-CV-5209, 2021 WL 4443126, at *29 (S.D.N.Y. Sept. 28, 2021) (finding that

supervisors did not engage in any "explicitly discriminatory conduct" when, among other things,

they allegedly asked plaintiff if he had "brain amnesia" and when was humiliated, embarrassed,

and subjected to belittling comments). Therefore, the Court must isolate the incidents that it can

consider before evaluating whether Plaintiff's hostile work environment claim survives summary

judgment.

### 1. Termination threat during FMLA Leave

In her Additional Statement of Material Facts, Plaintiff claims that while she was on

FMLA leave, she was repeatedly threatened with termination for missing work if she did not

have available FMLA. Pl.'s Add'l SMF ¶ 87. However, there is no evidence in the record that

links Defendants' actions to Plaintiff's protected characteristics. Indeed, Plaintiff's deposition

reveals that her conversations were about her FMLA balance. See Buczakowski Dep. at

64:12–16 ("my relationship with Tracey was kind of distant because every time she talked to me,

it was like a threat that if I didn't have FMLA, I would be treated like any employee under the

rules of the union contract and could be terminated for missing time."); id. at 66:1–3 ("she

informed me that I would not have enough FMLA, and that if I went out, there was a likelihood

of -- more than likelihood that I would be terminated."). Discussions about FMLA leave alone do

not necessarily implicate Plaintiff's protected characteristics. See Price v. Mount Sinai Hosp.,

458 F. App'x 49, 52 n.2 (2d Cir. 2012) ("First, an employer who determines that an employee

has a 'serious health condition' under the FMLA, 29 U.S.C. § 2612(a)(1)(D), does not

necessarily regard that employee as having a disability under the ADA."). Thus, without more,

the Court cannot consider this in evaluating Plaintiff's hostile work environment claim..

### 2. Greenia's Actions

Next, Plaintiff claims that "Defendant Greenia avoided her, did not give her assignments, and threatened her with discipline for an alleged failure to complete an employee health assessment approximately six months earlier." Opp'n at 14. Once again, there is no evidence in the record that Greenia avoided Plaintiff or did not give her assignments because of Plaintiff's protected characteristics, and so the Court must also disregard this allegation in evaluating the hostile work environment claim. As for the "threatened discipline," the Court is not convinced that this occurred because of Plaintiff's age or discipline, but making all inferences in favor of Plaintiff, the Court will consider it.

### 3. Remaining Incidents

Many of Plaintiff's remaining incidents must be excluded because there is no evidence in the record that these actions are related to Plaintiff's protected characteristics. Thus, in evaluating Plaintiff's hostile work environment claim, the Court will consider: (1) Defendants' statements to Plaintiff; (2) Defendants' internal statements about Plaintiff; (3) the release of Plaintiff's private medical information by Bergemann; (4) Greenia's threatened discipline when Plaintiff returned to work; and (5) Plaintiff's experience during the suspension and disciplinary process.

As mentioned previously, "the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive[.]" Littlejohn, 795 F.3d at 321. "Pervasive" harassment is harassment that is "more than episodic," and instead, "continuous and concerted." Hayut v. State Univ. of New York, 352 F.3d 733, 745 (2d Cir. 2003). Although "a mild, isolated incident does not make a work environment hostile, the test is whether the harassment is of such quality or quantity that a reasonable employee would find the conditions of

her employment <u>altered for the worse</u>." <u>Terry v. Ashcroft</u>, 336 F.3d 128, 148 (2d Cir. 2003)

(internal quotation marks omitted). "[T]he fact that the law requires harassment to be severe or

pervasive before it can be actionable does not mean that employers are free from liability in all

but the most egregious cases." <u>Feingold v. N.Y.</u>, 366 F.3d 138, 150 (2d Cir. 2004) (internal

quotation marks omitted). Finally, a "plaintiff need not show that her hostile working

environment was both severe <u>and</u> pervasive; only that it was sufficiently severe or sufficiently

pervasive, or a sufficient combination of these elements, to have altered her working conditions."

<u>Costello v. N.Y. State Nurses Ass'n</u>, 783 F. Supp. 2d 656, 673 (S.D.N.Y. 2011) (internal

quotation marks omitted).

      The Court finds that Plaintiff has failed to offer evidence to show that these actions were

sufficiently severe or pervasive. To begin, the Court notes that these actions occurred over

approximately two months. <u>See</u> <u>Finch v. Carrion</u>, No. 10-CV-9691, 2015 WL 5459991, at *5

(S.D.N.Y. July 9, 2015) ("A handful of incidents over the course of two months is not

sufficiently pervasive to establish a hostile work environment claim.").

      Furthermore, the cumulative effect of these actions would not allow a reasonable jury to

conclude that "the workplace is permeated with discriminatory intimidation, ridicule, and insult,

that is sufficiently severe or pervasive to alter the conditions of the victim's employment and

create an abusive working environment." <u>Rivera</u>, 743 F.3d at 20. Plaintiff can point to

Bergemann's comments in his April 2017 parking request e-mail and during the May 2017

atrium meeting, as well as DiCarlo's comments to Plaintiff in May 2017 and any second-hand

comments she made. Still, this alone is not sufficient because these comments appear to be

"episodic", rather than "continuous and concerted." <u>Compare</u> <u>Lessambo v.</u>

24

PricewaterhouseCoopers, L.P., No. 08-CV-6272, 2010 WL 3958787, at *11 (S.D.N.Y. Sept. 27,

2010) (concluding that the utterance of "three offensive remarks about [ ] national origin" in a

one month period did not suffice to support a hostile-work-environment claim) with Vazquez v.

Southside United Hous. Dev. Fund Corp., No. 06-CV-5997, 2009 WL 2596490, at *15

(E.D.N.Y. Aug. 21, 2009) (denying summary judgment when Plaintiff "suffered daily harassment

involving the use of racial epithets" over a three-month period).

     The release of Plaintiff's private medical information by Bergemann does not support a

finding that such disclosure created or added to a hostile work environment. In Cherry v. New

York City Hous. Auth., No. 15-CV-6949, 2021 WL 4481004, at *28 (E.D.N.Y. Sept. 30, 2021),

the Court held that a hostile work environment claim survived summary judgment when the

record revealed that a supervisor disclosed a plaintiff's confidential medical condition in a "town

hall type meeting," as well as engaging in public discussion of plaintiff's private medical

condition. The same is not true here. Although Bergemann should not have disclosed Plaintiff's

confidential medical information on two occasions, the disclosures were limited and there is no

evidence in the record that the disclosures altered Plaintiff's conditions of employment.[8] See also

Roberts v. Clark Cnty. Sch. Dist., 215 F. Supp. 3d 1001, 1017 (D. Nev. 2016) (finding that

public disclosure of sensitive information regarding an employee's gender transition, which

"invited coworkers to ask questions about his transition" and led to "department staff [making]

---

     [8] The two disclosures were when Bergemann forwarded Plaintiff's parking request e-mail to the Parking Office and Bergemann's statements in the atrium. See Opp'n at 14. The current situation is not analogous to Cherry. Although employees were reporting to management that they were concerned about Plaintiff's health in coming to work, these comments were before the atrium meeting. See Bergemann Dep. at 140:1–145:10. Moreover, there is nothing to indicate that the comments had a connection to the first disclosure, or that they increased after the second disclosure.

inappropriate remarks about his genitalia, among other things," created a material issue of fact as to whether the defendants' conduct was sufficiently severe as to create a hostile work environment).

The alleged threat of discipline by Greenia does not sufficiently contribute to Plaintiff's hostile work environment claim. Contrary to Plaintiff's arguments, the record evidence reveals that Greenia reached out to Plaintiff in May 2017 because her health assessment form had been missing since September 2016, and she could have faced discipline. See Dkt. No. 132-6, Ex. CG 11. Plaintiff responded to Greenia within several minutes, and explained the situation. Id. And the situation was resolved satisfactorily, without Plaintiff having to face any discipline. See id. at 163:3–4. Thus, this situation also did not alter the conditions of her employment. See Guerrero Toro v. NorthStar Demolition & Remediation, 366 F. Supp. 3d 449, 468 (W.D.N.Y. 2019) (finding that conditions of employment were not altered when plaintiff was permitted to return to work after clarifying the conflicting medical information that resulted in his one-week suspension).

Finally, the Court considers Plaintiff's discipline. Here, the parties dispute whether Plaintiff was suspended for 3 or 4.5 days, but courts have granted summary judgment for similar suspensions. See, e.g., Braheney v. Town of Wallingford, No. 00-CV-2468, 2004 WL 721834, at *4 (D. Conn. Mar. 30, 2004) (four suspensions, which ranged from a few days to a few weeks, over a three-year period was insufficiently continuous and concerted to constitute hostile work environment), Holmes v. Astor Servs. for Child. & Fams., No. 16-CV-2260, 2017 WL 3535296, at *6 (S.D.N.Y. Aug. 16, 2017) ("The elimination of the LPN position and Plaintiff's two-day suspension do not permit Plaintiff's hostile work environment claim to survive summary

judgment"), Guerrero, 366 F. Supp. 3d at 468–69 (collecting cases where suspensions ranging

from three days to ten days did not rise to the necessary level of severity or pervasiveness to

maintain a hostile work environment claim). In addition, Plaintiff argues that she "was subjected

to a false accusation of misconduct and resulting disciplinary suspension and hearing with an

unduly harsh penalty." Opp'n at 15. Improper, unfair, or false discipline can contribute to a

hostile work environment. See Anderson v. Nassau Cnty. Dep't of Corr., 558 F. Supp.2d 283,

295–96 (E.D.N.Y. 2008) (denying summary judgment on hostile-work-environment claim based

on discriminatory statements, disparate treatment, failure to promote, and improper discipline);

see also Costello, 783 F. Supp. 2d at 679–80 (finding no hostile work environment where

plaintiff alleged, in part, that she was subjected to false, negative disciplines relating to her job

performance). But in order for such discipline to support a hostile work environment claim, there

needs to be evidence in the record that the disciplinary action was connected to Plaintiff's

protected characteristics. See Roberts v. Fruit Fresh Up, No. 08-CV-274, 2011 WL 2730946, at

*7 (W.D.N.Y. July 12, 2011) (granting summary judgment on the hostile work environment

claim where, among other things, plaintiff "provide[d] no facts that connect defendant's

disciplinary actions to his race"); see also Anderson, 558 F. Supp. 2d at 296 ("she was

disciplined for receiving overtime payments, a condition not encountered by male officers.").

That is not the case here because although Plaintiff alleges her discipline was not fair, she has not

shown that unfair discipline was connected to her age or disability.

When analyzing the relevant incidents and making all inferences in favor of Plaintiff, her

hostile work environment claim is based on a handful of comments, the limited release of her

medical information, a "threat" of discipline that was quickly resolved, and improper discipline.

This alleged pattern of behavior does not exhibit the severity or pervasiveness of an actionable hostile work environment. See, e.g., DelaPaz v. N.Y. City Police Dep't, No. 01-CV-5416, 2003 WL 21878780, at *3 (S.D.N.Y. Aug. 8, 2003) (observing that "the Second Circuit erected a remarkably high hurdle with respect to the level and frequency of offensive conduct that must be present in order to sustain" a hostile work environment claim), McGrath v. Arroyo, No. 17-CV-1461, 2019 WL 3754459, at *8 (E.D.N.Y. Aug. 8, 2019) (noting that there is a "high standard for an objectively hostile work environment."); see also Mormol v. Costco Wholesale Corp., 364 F.3d 54, 58-59 (2d Cir. 2004) (affirming summary judgment in favor of employer where two instances of overt sexual solicitation over two months and a subsequent disciplinary write up were "not sufficiently severe or pervasive to create a hostile work environment"). Accordingly, to the extent Plaintiff's Amended Complaint alleges a hostile work environment cause of action, Defendants are granted summary judgment on that claim and it is dismissed.

### C.  Constructive Discharge

In this District, "to demonstrate constructive discharge, [a] plaintiff must demonstrate harassment that is more severe and pervasive than that required to show a hostile work environment." Ternullo v. Reno, 8 F. Supp. 2d 186, 192 (N.D.N.Y. 1998) (citing Christopher-Ketchum v. Agway Energy Prods., 988 F. Supp. 610 (N.D.N.Y. 1997)). "Plaintiff's claim for constructive discharge must be dismissed because it relies on the failed hostile-work-environment claim; to find otherwise would 'make the graver claim of hostile-environment constructive discharge easier to prove than its lesser included component, hostile work environment.'" Baptiste v. Cushman & Wakefield, No. 03-CV-2102, 2007 WL 747796, at *12 (S.D.N.Y. Mar. 7, 2007) (quoting Pennsylvania State Police v. Suders, 542 U.S.

129, 149 (2004)); see also Divers v. Metro. Jewish Health Sys., No. 06-CV-6704, 2009 WL

103703, at *19 (E.D.N.Y. Jan. 14, 2009), aff'd, 383 F. App'x 34 (2d Cir. 2010) ("since [Plaintiff]

fails to make the threshold showing of severe or pervasive conduct necessary to support a claim

for hostile work environment, she can neither survive summary judgment on the constructive

discharge claim, which requires evidence of even more severe conditions."). Accordingly,

Defendants are granted summary judgment on the constructive discharge claim and it is

dismissed.

### D. NYSHRL Retaliation[9]

Retaliation claims under the NYSHRL are analyzed under the familiar McDonnell

Douglas burden-shifting framework. See Hicks v. Baines, 593 F.3d 159, 164 (2d Cir. 2010)

(analyzing all of plaintiff's retaliation claims pursuant to Title VII principles); Reed v. A.W.

Lawrence & Co., 95 F.3d 1170, 1177 (2d Cir. 1996) (considering plaintiff's state law claims

together with her Title VII claims "because New York courts rely on federal law when

determining claims under the [NYSHRL]").

Under this framework, a plaintiff must first make out a prima facie case by showing that:

(1) the employee engaged in protected activity; (2) the employer was aware of that activity; (3)

the employee suffered a materially adverse action; and (4) there was a causal connection between

the protected activity and that adverse action. See Rivera, 743 F.3d at 24. "A plaintiff's burden of

establishing a prima facie case is de minimis." Abdu–Brisson v. Delta Air Lines, Inc., 239 F.3d

456, 467 (2d Cir. 2001). If the plaintiff meets this minimal burden, the burden shifts to the

---

[9] This Court previously dismissed Plaintiff's ADA retaliation claims at the motion to dismiss stage. See Buczakowski v. Crouse Health Hosp., Inc., No. 5:18-CV-330, 2019 WL 6330206, at *10 (N.D.N.Y. Nov. 26, 2019).

employer, who must offer a legitimate, nonretaliatory reason for the adverse action. See Terry v. Ashcroft, 336 F.3d 128, 138 (2d Cir. 2003); see also Meiri v. Dacon, 759 F.2d 989, 996–97 (2d Cir.1985). If the employer succeeds at the second stage, then the presumption of retaliation dissipates, and the plaintiff must show that, but for the protected activity, she would not have been subject to an adverse action. See Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 360 (2013). A plaintiff alleging retaliation for complaining about a discriminatory employment practice must show that retaliation was a "but-for" cause of the adverse action, and not simply a "substantial" or "motivating" factor in the employer's decision. Id. at 349, 360. "However, 'but-for' causation does not require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." Zann Kwan v. Andalex Grp. LLC, 737 F.3d 834, 846 (2d Cir. 2013). "The plaintiff [] bears the ultimate burden to show that the employer's proffered reason was merely a pretext for an unlawful motive." Bentley v. AutoZoners, LLC, 935 F.3d 76, 88–89 (2d Cir. 2019) (internal quotations omitted). To prevail at the summary judgment stage in a retaliation case, a defendant must show that the plaintiff failed to make out a prima facie case of retaliation, or that the defendant has offered legitimate, nonretaliatory reasons for the challenged actions, and there are no triable issue of fact as to whether the defendant's explanations were pretextual. Vosburgh v. Am. Nat. Red. Cross, No. 08–CV–0653, 2014 WL 4826688, at *8 (N.D.N.Y. Sept. 29, 2014) (Kahn, J.) (citing Delrio v. City of N.Y., 91 A.D.3d 900, 938 N.Y.S.2d 149, 151 (App. Div. 2012)).

Plaintiff points to two instances where she engaged in protected activity: (1) taking leave for her cancer treatment; and (2) her complaints to DiCarlo and Bergemann about the

discriminatory treatment she faced. See Opp'n at 22–23. Because the Court denies summary

judgment in relation to the retaliation claim about Plaintiff's complaints about her discriminatory

treatment, the Court does not need to address Plaintiff's alternative argument that she faced

retaliation for taking leave for her cancer treatment.

### 1. Protected Activity

For the first time in their Reply, Defendants argue that Plaintiff's complaints wereactually

"insubordinate and disruptive conduct [that] clearly fell outside the bounds of protected

activity[.]" Reply at 19. "This Circuit has made clear it disfavors new issues being raised in reply

papers." Rowley v. City of New York, No. 00-CV-1793, 2005 WL 2429514, at *5 (S.D.N.Y.

Sept. 30, 2005) (collecting cases). Thus, the Court does not need to consider these arguments.

### 2. Pretext

Defendants do not argue that Plaintiff failed to make out a prima facie case of retaliation.

Even if they did, "Second Circuit case law makes clear that a court may simply assume that a

plaintiff has established a prima facie case and skip to the final step in the McDonnell Douglas

analysis, as long as the employer has articulated a legitimate, nondiscriminatory reason for the

adverse employment action." Dorcely v. Wyandanch Union Free Sch. Dist., 665 F. Supp. 2d 178,

199 (E.D.N.Y. 2009) (citing cases). Here, Defendants articulated a legitimate, nonretaliatory

reason: Plaintiff's inappropriate conduct on May 11th. Defs.' Mem. of L. at 18.

Viewing the record in the light most favorable to Plaintiff, she has produced evidence

from which a reasonable jury could find that Defendants' reasons for suspending and disciplining

Plaintiff are false and pretextual. To begin, Plaintiff raises triable issues regarding procedural

deviations during Plaintiff's suspension and disciplinary hearing. Plaintiff claims that no

progressive discipline was employed by Defendants, as required by the collective bargaining agreement. See Pl.'s Add'l SMF ¶ 181. Additionally, Dittrich admitted that she did not verbally warn Plaintiff that her conduct was going to result in discipline. See Dittrich Dep. at 89:9–12. Still, there appears to be a factual dispute, which is best left to a jury to resolve, on what happened at the meeting in Bergemann's office, and whether progressive discipline was properly employed. According to Defendants, Plaintiff was yelling, Def.'s SMF ¶ 48, and "[d]iscipline for yelling in this similar circumstance would start at, at the very least, a suspension," Dittrich Dep. at 90:3–5. However, Plaintiff claims that the meeting was cordial and her voice was very quiet. See Buczakowski Dep. at 136:10–20. Drawing all reasonable inferences in favor of Plaintiff, there were procedural irregularities that could support an inference of retaliatory motivation. See Eldaghar v. City of N.Y. Dep't of Citywide Admin. Servs., No. 02-CV-9151, 2008 WL 2971467, at *12–13 (S.D.N.Y. July 31, 2008) (finding evidence of procedural irregularities to raise "genuine issues of material fact regarding . . . retaliatory motivation"); see also Villar v. City of New York, 135 F. Supp. 3d 105, 125 (S.D.N.Y. 2015) ("Departures from procedural regularity can be evidence of pretext."). Plus, temporal proximity can be considered as evidence of pretext, even if timing alone is not enough to establish pretext. See Dedjoe v. McCarthy, No. 15-CV-1170, 2017 WL 4326516, at *15 (N.D.N.Y. Sept. 28, 2017) ("temporal proximity can be considered as some evidence of pretext [for retaliation]") (Kahn, J.); see also Yoselovsky v. Associated Press, 917 F. Supp. 2d 262, 281 (S.D.N.Y. 2013) ("While timing alone may be a basis for establishing a prima facie case, it is not enough to establish pretext at the third stage of the McDonnell Douglas analysis.").

32

Furthermore, the Court observes that the form of discipline (in particular, applying Plaintiff's vacation time during the time of her suspension) can also be evidence of pretext in this case. Plaintiff claims that she told Bergemann that she had repeatedly been threatened with termination since becoming ill, and that the Hospital's management was aware that Plaintiff used her vacation time for her medical treatment. Pl.'s Add'l SMF ¶¶ 145, 195. Thus, a jury could reasonably find that this specific form of discipline (taking away Plaintiff's vacation time which Defendants knew or should have known was used for Plaintiff's medical treatments) was to punish her for her complaints about discriminatory treatment. Cf. Salerno v. MPI Mgmt., LLC, No. 19-CV-0145, 2020 WL 4587405, at *5 (W.D. Mo. May 13, 2020) (considering "the availability of lesser forms of discipline" as evidence of pretext). Even if the Court does not consider this as evidence of pretext, the Court finds that the very short gap of time between Plaintiff's complaints and her suspension/discipline, along with the procedural irregularities that preceded Plaintiff's discipline, are sufficient to permit a reasonable jury to conclude that Plaintiff's discipline would not have been made but-for Plaintiff's complaints to DiCarlo and Bergemann.

### 3. Individual Liability

Plaintiff seeks to impose individual liability on Bergemann, Dittrich, Greenia, and DiCarlo. The NYSHRL makes it unlawful for "any employer" to discriminate against any person because she has opposed unlawful discrimination. N.Y. EXEC. LAW § 296(1)(e). "A supervisor is an 'employer' for purposes of establishing liability under the NYSHRL if that supervisor actually participates in the conduct giving rise to the discrimination." Feingold, 366 F.3d at 157 (alterations and internal quotation marks omitted). Additionally, the statute states that "[i]t shall

33

be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or to attempt to do so." N.Y. EXEC. LAW § 296(6). "To be found liable under this provision, an individual need not have supervisory or hiring and firing power but still must have <u>actually participated</u> in the conduct giving rise to the claim of discrimination and engaged in direct, purposeful, participation." <u>Emmons v. City Univ. of New York</u>, 715 F. Supp. 2d 394, 420 (E.D.N.Y.2010) (internal citation and quotation marks omitted). "This extends to personal liability for aiding and abetting allegedly unlawful discrimination by [an] employer even where [an individual defendant's] actions serve as the predicate for the employer's vicarious liability, so long as the employer's conduct has also been found to be discriminatory under the NYSHRL." <u>Farmer v. Shake Shack Enters., LLC</u>, 473 F. Supp. 3d 309, 337 (S.D.N.Y. 2020) (internal quotation marks omitted).

The Court has only found Plaintiff's failure to accommodate and NYSHRL retaliation claims to have survived summary judgment for now, and thus, any individual liability analysis will be limited to those claims. Bergemann, Dittrich, and DiCarlo are not entitled to summary judgment on the aiding and abetting claims because the record evidence reveals that the three of them participated in Plaintiff's disciplinary determination:

Q: Who decided it should be a Class C offense?

MR. JACOBSON: Objection to the form.

A: That would have been a collaborative decision.

Q: Between you and who?

A: Myself [Dittrich] and John [Bergemann] and Dorothy [DiCarlo].

34

Dittrich Dep. at 123:10–16; see also White v. Pacifica Found., 973 F. Supp. 2d 363, 378

(S.D.N.Y. 2013) ("[Individual defendant] is entitled to summary judgment on Plaintiff's aiding

and abetting claims because. . .Plaintiff has not offered any evidence that [individual defendant]

played any role in any actionable discriminatory act committed against him.").

 The individual liability claims against Greenia are a closer call. At least one court has

found that mere presence at a meeting "without comment or intervention" is not sufficient to

demonstrate that someone participated in the alleged discriminatory conduct. See, e.g., Monastra

v. NYNEX Corp., No. 99-CV-8917, 2000 WL 1290596, at *8 (S.D.N.Y. Sept. 12, 2000). But

that was not the case here because the record evidence reveals that Greenia did participate to

some extent during the disciplinary hearing. See Dittrich Dep., Ex. LD 8. Specifically, Plaintiff

asked Greenia whether she was ever rude to her, and Greenia responded, "Yes - when I was

talking to you abt [sic] training - you were rolling your eyes w/ [sic] a negative attitude + tone."

Id. Moreover, this is not a situation where an individual defendant merely informed an employee

about their discipline. See Cerrato v. Durham, 941 F. Supp. 388, 396 (S.D.N.Y. 1996)

(communicating termination to plaintiff "is not conduct that rises to the level of aiding and

abetting, and is unlike the direct, purposeful participation of defendants whom other courts have

found to be subject to individual liability as aiders and abettors."). Still, it is unclear from the

record whether Greenia engaged in direct and purposeful participation. Indeed, Greenia, DiCarlo,

and Bergemann had difficulty remembering the disciplinary hearing at their depositions. See

Greenia Dep. at 110:2–5; Bergemann Dep. at 256:4–5; DiCarlo Dep. at 170:4–171:5. But it

appears that DiCarlo and Greenia did discuss verbally counseling Plaintiff before the disciplinary

hearing. See id. at 171:23–24 ("Cathy decided -- decided to meet with HR and determine how we

were going to follow-up on it."). Since there remains a question of fact as to whether Greenia can be held individually liable to the NYSHRL retaliation claim, Defendants' motion for summary judgment with respect to this issue is denied. See Nodelman, 2000 WL 502858, at *12.

## V.      CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Defendants' Motion for Summary Judgment (Dkt. No. 125) is **GRANTED in part** and **DENIED in part**; and it is further ordered

**ORDERED**, that with respect to the hostile work environment and constructive discharge claims, Defendants' Motion is **GRANTED**; and it is further

**ORDERED**, that with respect to the failure to accommodate, NYSHRL retaliation, and NYSHRL individual liability claims, Defendants' Motion is **DENIED**; and it is further

**ORDERED**, that within thirty days of this memorandum-decision and order, Plaintiff is directed to file a ten-page submission setting forth the Brady analysis for the failure to accommodate claim, and Defendants are directed to file a ten-page opposition, two weeks following Plaintiff's submission; and it is further

**ORDERED**, that the Clerk serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED:      February 7, 2022
             Albany, New York

LAWRENCE E. KAHN
United States District Judge